UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| THE UNITED STATES and<br>THE ADMINISTRATORS OF THE TULANE EDUCATIONAL FUND,<br><br>              Plaintiffs,<br>v.<br><br>CYTOGEL PHARMA, LLC,<br><br>              Defendant. | CIVIL ACTION NO:<br><br>SECTION:<br><br>JUDGE:<br><br>MAG: |

## COMPLAINT

Plaintiffs, the United States (the "government") and The Administrators of the Tulane Educational Fund ("Tulane") (collectively, "Plaintiffs"), by their undersigned attorneys, for their Complaint against Defendant Cytogel Pharma, LLC ("Cytogel"), herein allege:

## NATURE OF THE ACTION

1. This is an action for declaratory judgments of (1) patent ownership and (2) patent inventorship arising from Cytogel's repeated claims to sole ownership of U.S. Patent No. 8,716,436 B2 (the '436 Patent) (Exhibit A).

## THE PARTIES

2. Plaintiff United States is the government of the United States of America acting through its Department of Veteran Affairs ("VA"), headquartered at 810 Vermont Avenue NW, Washington, District of Columbia 20420.

3. Plaintiff The Administrators of the Tulane Educational Fund is the corporate entity of Tulane University, and specifically, a non-profit corporation organized under the laws

1

of the state of Louisiana with a principal place of business located at 6823 St. Charles Avenue, New Orleans, Louisiana 70118.

4. On information and belief, Defendant Cytogel Pharma, LLC is a domestic limited liability company organized under the laws of the state of Connecticut with a principal place of business located at 3 Thorndal Circle, Darien, Connecticut 06820.

## JURISDICTION

5. This Court has subject matter jurisdiction over this declaratory judgment action pursuant to 28 U.S.C. §§ 1331, 1345, 1367, 2201, and 2202.

6. This Court has personal jurisdiction over Defendant Cytogel under the Louisiana Long-Arm Statute, La. Rev. Stat. § 13.3201(A)(1), as Cytogel has conducted business in this state with Dr. James E. Zadina and with Tulane on matters closely related to the subject matter of this suit.

7. Venue is appropriate in this Court under 28 U.S.C. § 1391(b)(2).

## FACTS

**I.      Research Conducted by Dr. Zadina and Dr. Hackler for Tulane and the VA**

8. This case relates to the ownership of patent rights originating in the work of Drs. James E. Zadina and Lazlo Hackler, researchers developing new compounds that bind the *Mu* opioid receptor, as joint employees of both the VA and Tulane University.

9. Commonly called opioids, these compounds have traditionally been used in the treatment of acute and chronic pain since the advent of morphine in the 19th century. While this class of drugs has been generally effective in treating pain, they also typically have potentially deadly side effects for patients by (1) suppressing respiration and (2) being highly addictive.

10. As a researcher working at the VA Medical Center in New Orleans, Dr. Zadina has sought to create improved opioids that lack the harmful side effects. Dr. Zadina has conducted his research as a Dual Appointment Personnel, serving as both a VA senior research scientist and a Professor of Medicine, Pharmacology and Neuroscience at the Tulane University School of Medicine. Dr. Zadina has held his position at Tulane University since 1978 and at the VA since 1980, and is a paid employee of the VA. Dr. Laszlo Hackler, who died in 2013, was a chemist who worked with Dr. Zadina in synthesizing the new opioid compounds for testing and evaluation, and who aided Dr. Zadina in the design of the compounds. Dr. Hackler was also a Dual Appointment Personnel, and thus effectively a joint VA and Tulane University employee.

11. As Dual Appointment Personnel, Drs. Zadina and Hackler are each obligated to disclose intellectual property from their work to the VA and to Tulane in order for each entity to make a determination of rights with respect to rights, title and interest in the invention. These actions accord with 37 C.F.R. § 501.6(a), 38 C.F.R. § 1.652, the Bayh-Dole Act (*e.g.*, 35 U.S.C. § 202(e)), and 15 U.S.C. § 3710a. Here, the VA and Tulane each asserted ownership rights in the eventual '436 Patent whereupon Drs. Zadina and Hackler, pursuant to their employment agreements with the VA and Tulane's Intellectual Property Policy and Procedures, then assigned those rights to the VA and Tulane.

12. In 2003, the VA and Tulane entered into a Cooperative Technology Administration Agreement, which spells out, *inter alia*, the parties' respective rights and responsibilities for jointly-owned patents (the "VA-Tulane Agreement").

13. Under the VA-Tulane Agreement, Tulane has the sole right to license patents and patent applications it jointly owns with the VA. Tulane also handles the prosecution of jointly-owned patent applications before the U.S. Patent and Trademark Office ("PTO").

## II. Research Leading to the 1st Generation '958 and '578 Patents

14. In the 1990s, Dr. Zadina, along with Dr. Hackler and Dr. Abba J. Kastin of Tulane University, invented a group of cyclic peptide-based opioid compounds (the "1st Generation" compounds), which are structurally, and to some extent functionally, different from conventional opioid peptides.

15. Peptides are chemical compounds composed of chains of amino acids that are chemically bonded together. When bonded together in a peptide, the amino acids often are referred to as "residues" or "amino acid residues." Conventional peptides used in opioid compounds are made up of a series of amino acid residues that are bonded together in a linear chain. The number of amino acids in the peptide, their order in the peptide chain, and how they are bonded together can have dramatic effects on the pharmaceutical and physical properties of opioid compounds. Moreover, these effects with regard to effectiveness (in pain relief), solubility, and other key pharmaceutically-important parameters are completely unpredictable. An example of a linear peptide is schematically illustrated below.



**Linear Peptide**

16.  The early 1st Generation compounds invented by Drs. Zadina, Hackler, and Kastin feature cyclic peptides composed of four amino acid residues with three residues linked together in a "triangular" ring by a bond between a side-chain ("SC") of one amino acid to what would be the tail end of the last amino acid residue, as illustrated below for the compound designated as Cyt-1010 by Cytogel (compare with the linear peptide illustrated in Paragraph 15, *supra*). In the illustration, Tyr, D-Lys, Trp, and Phe are internationally-accepted designations for the amino acids L-tyrosine, D-lysine, L-tryptophan, and L-phenylalanine. The formula for Cyt-1010 is commonly written as H-Tyr-c-[D-Lys-Trp-Phe], as in claim 2 of the '958 Patent.



17.  Based on the research of Drs. Zadina, Hackler, and Kastin on the 1st Generation compounds, U.S. Patent Application No. 08/824,109 was filed on March 25, 1997, entitled "Mu-Opiate Receptor Peptides" ("the '109 Application").

18.  Ultimately, the PTO issued two U.S. patents covering different aspects of the 1st Generation compounds originally disclosed in the '109 Application: U.S. Patent Nos. 5,885,958 ("the '958 Patent") (attached as Exhibit B) and 6,303,578 B1 ("the '578 Patent") (attached as Exhibit C) (collectively, the "1st Generation Patents"). The '958 Patent issued on March 23, 1999, and the '578 Patent issued on October 16, 2001.

19. The '958 and '578 Patents were assigned only to Tulane, as the VA chose to assign all of its ownership rights to Tulane, which remains the sole owner of both 1st Generation Patents.

### III. Patent License Agreement Between Cytogel and Tulane

20. On December 1, 2003, Cytogel entered into a license agreement with Tulane for the 1st Generation Patents ("Patent License Agreement"). On information and belief, Cytogel was a start-up company interested in making new pharmaceutical opioids at the time it entered into the Patent License Agreement.

21. While the Patent License Agreement includes a confidentiality provision, the existence of the license and the association of Cyt-1010 to the license have been disclosed by Cytogel and is currently disclosed on Cytogel's website, http://www.cytogelpharma.com/platform-technologies.html and http://www.cytogelpharma.com/analgesics.html.

22. The governing law and venue are specified in the Patent License Agreement.

23. To date, Tulane has received significant royalty payments from Cytogel under the Patent License Agreement.

### IV. Cytogel Consultancy Agreement with Dr. Zadina

24. Following the execution of the Patent License Agreement, Dr. Zadina worked with Cytogel in Louisiana by advising Cytogel, *inter alia*, on the properties and characteristics of compounds described in the 1st Generation Patents, and primarily for the compound known as Cyt-1010 ("Cyt-1010 Development").

25. Initially, Dr. Zadina worked under an oral agreement with Cytogel and ultimately signed a consultancy agreement on June 21, 2007 ("Consultancy Agreement") (attached as

6

Exhibit D) relating to the Cyt-1010 Development work.  Dr. Zadina performed his work with Cytogel outside of his normal duties for the VA and Tulane.

26. Dr. Zadina was not engaged to invent new opioid compounds for Cytogel.

27. Dr. Zadina's consultancy never involved work with any opioids other than those described in the licensed 1st Generation Patents, *i.e.* those featuring the triangular peptide ring.

28. Dr. Hackler did not have a consultancy agreement or working relationship with Cytogel.

29. The Consultancy Agreement states that Dr. Zadina "acknowledges that any inventions, processes, methods, techniques, formulae, compounds, . . . patents, trade secrets, and any other intellectual properties that may result or emerge from materials or information provided by Cytogel . . . shall remain the sole and exclusive property of and for the benefit of Cytogel." Ex. D at ¶ 8.  This provision, however, is immediately preceded by an acknowledgement that Dr. Zadina's consultancy activity "is not related to, or performed as part of, or during, his official duties at the Department of Veteran Affairs or Tulane University." *Id*.

30. Under the Consultancy Agreement, Dr. Zadina primarily worked to advise Cytogel about the specific properties and characteristics of Cyt-1010, which is among the group of compounds claimed and described by the '958 and '578 Patents, and which is schematically illustrated in Paragraph 16, *supra*.

31. While Cyt-1010 showed promise as a potential opioid drug, through his research, Dr. Zadina identified (and reported to Cytogel) problems with Cyt-1010 that could impede Cytogel's plans to develop it into an improved-opioid drug.  Specifically, Dr. Zadina's earliest research revealed issues related to the solubility of Cyt-1010 in water-based formulations, a common problem in developing pharmaceutical formulations.  Dr. Zadina's research also

7

uncovered problems with respiratory suppression by Cyt-1010. Respiratory suppression is a well-known and extremely common side-effect of opioids. Thus, the problems with Cyt-1010 would not have been particularly surprising to those skilled in the opioid drug field, such as Dr. Zadina.

32. Based on information and belief, by 2011, Cytogel was actively working on developing Cyt-1010 as a compound for which it or a licensee (or buyer) could seek approval from the U.S. Food and Drug Administration ("FDA") to sell an opioid drug based on Cyt-1010.

33. While consulting with Cytogel on the Cyt-1010 Development work, Dr. Zadina continued to be employed by the VA and Tulane and continued his long-standing research program on peptide-based opioids in conjunction with Dr. Hackler. The research of Drs. Zadina and Hackler for Tulane and the VA eventually led to the invention of novel, "2nd Generation" compounds. This work for Tulane and the VA was independent of, and unrelated to, the Cytogel work, and was performed without recourse to, or use of, any confidential information of Cytogel.

34. On September 8, 2010, Tulane informed Cytogel that a provisional patent application had been filed based on the new 2nd Generation compounds created by Dr. Zadina and Dr. Hackler for the VA and Tulane. The provisional application ultimately led to the '436 Patent and certain pending applications, the ownership of which is at issue in this Complaint. Among other things, the 2nd Generation compounds offered reduced side effects, such as less respiratory suppression, and also provided improved solubility, relative to the 1st Generation compounds.

35. After learning of the provisional application, Cytogel asserted to Tulane that Cytogel owned this new application. As this dispute continued, as described in Section VII

8

below, Dr. Zadina's working relationship with Cytogel deteriorated.  Dr. Zadina ultimately terminated the Consultancy Agreement, by written notice, on July 5, 2013.

36. During his consultancy, Dr. Zadina received in excess of $100,000 in compensation for his work on behalf of Cytogel.

37. To date, no Cytogel opioid drugs have been approved for sale by the FDA.

## V. Research Leading to the 2nd Generation Compounds of the '436 Patent

38. The 2nd Generation compounds are a group of new peptide-based opioids that feature peptides composed of five or six amino acid residues in which four of the amino acids (the second through the fifth residues) are arranged in a "square" ring.  The illustration below schematically shows examples of five-amino acid (pentapeptide) and six-amino acid (hexapeptide) versions of the 2nd Generation compounds.



39. The peptide ring in the 2nd Generation compounds is formed by a side-chain to side-chain bond between the side chains of the second and fifth amino acids forming a "square" ring of four amino acids.  In contrast, the ring in the 1st Generation compounds of the earlier '958 and '578 Patents are formed by a side-chain-to-tail bond to form a "triangular" ring of three

9

amino acids, as illustrated in the comparison, below.  In addition to the differences in ring configuration, the 2nd Generation peptides of the '436 Patent have a tail end, while the 1st Generation compounds do not.  Thus, there are major structural distinctions between the 1st Generation and 2nd Generation compounds.



40.     As discussed in Paragraph 15, *supra*, even minor changes in the structure of a peptide chain of an opioid drug can have profound and unpredictable effects on its properties.  The 2nd Generation compounds exhibit improvements in solubility and reduced side-effects relative to the 1st Generation compounds.  There also are major differences in analgesic and selectivity properties between the 1st Generation compounds disclosed in the '958 and '578 patents and the 2nd Generation compounds disclosed in the '436 Patent.

41.     Drs. Zadina and Hackler's research efforts were conducted under their duties as Dual Appointee Personnel of the VA and Tulane.  None of these efforts were funded by Cytogel, and no Cytogel confidential information was used in the invention of the 2nd Generation compounds.  The improvements in solubility and the reduced side effects of these new 2nd Generation compounds were not predictable from the structures of the compounds of the prior art (*e.g.*, the 1st Generation compounds and linear opioid peptides).

10

42. In the peptide and pharmaceutical fields, it is simply impossible to predict how such structural changes will affect the activity of specific compounds. The Cyt-1010 work performed by Dr. Zadina for Cytogel related only to a specific compound (Cyt-1010) of the 1st Generation patents. In contrast, the work of Drs. Zadina and Hackler for the VA and Tulane focused on the invention of entirely new "2nd Generation" opioid compounds with an entirely new peptide structure, and thus unpredictable (and previously unknown) properties.

## VI. Prosecution and Assignment of the '436 Patent at the PTO

43. The provisional patent application on the 2nd Generation compounds was filed with the PTO on July 9, 2010. Subsequent non-provisional patent applications were filed, which ultimately led to the issuance of the '436 Patent. *See* Ex. A (cover page). Currently, there are also three other applications pending in the PTO relating to the 2nd Generation compounds: U.S. Patent Application No. 14/268,057 (the '057 Application), U.S. Patent Application No. 14/845,813 (the '813 Application), and U.S. Patent Application No. 14/974,249 (the '249 Application), which are all assigned to, and co-owned by, the VA and Tulane.

44. During prosecution of the '436 Patent before the PTO, the Patent Examiner initially rejected the pending claims based on prior art references that included, *inter alia*, the 1st Generation '958 and '578 Patents. The Examiner asserted that the 2nd Generation compounds were just "obvious" variants of compounds disclosed in the prior art, including the 1st Generation compounds.

45. In response, the inventors successfully argued that (1) the triangular ring of the 1st Generation compounds was structurally distinct from the square ring of the compounds in the eventual '436 Patent, (2) the square-ring compounds had improved properties not predicted in the prior art, and (3) the 1st Generation patents would not have led one of ordinary skill in the art to

create the claimed 2nd Generation compounds as agents for pain relief.  Regarding improved properties, the inventors cited data in their application that showed the 2nd Generation compounds exhibited unexpectedly positive results in treating pain.

46.  In its very next action, the Patent Examiner now agreed that the 2nd Generation (square-ring) compounds were a patentable advance over the 1st Generation (triangular-ring) compounds, and issued the '436 Patent.  Accordingly, the Examiner issued a Notice of Allowance based on the same structural differences that exist between the compounds Dr. Zadina researched for Cytogel and those he invented for the VA and Tulane.  The '436 Patent issued on May 6, 2014.  The claims of the '436 Patent are generally directed to (1) compounds featuring a "square" peptide ring formed by a side-chain to side-chain bond between the second and fifth amino acids, (2) pharmaceutical compositions employing these compounds, and (3) methods of treating pain by administering analgesic amounts of these compounds.  Ex. A (Cols. 25-26).

47.  Prior to allowance, on August 22, 2012, Drs. Zadina and Hackler executed a formal assignment of their ownership rights in the eventual '436 Patent to both Tulane and the VA.  In accordance with 35 U.S.C. § 261, Tulane recorded this assignment with the PTO on September 25, 2012.

**VII.   Cytogel's Unsubstantiated Claims to Ownership of the '436 Patent**

48.  After the provisional application was filed in 2010, John Christie, Executive Director of Tulane's Office of Technology Transfer and Intellectual Property Development, contacted Dean Maglaris, the Chief Executive Officer of Cytogel, to offer Cytogel licensing rights to the eventual '436 Patent, in addition to, and distinct from, Cytogel's existing license to the '958 and '578 Patents.

49. At that time, Mr. Maglaris stated that Cytogel was not interested in a license and contended that Cytogel, in fact, owned all rights to the technology that became the '436 Patent based on the terms of Dr. Zadina's Consultancy Agreement, a position it would consistently repeat.

50. Between 2011 and 2016, Tulane repeatedly and unsuccessfully attempted to resolve this ownership dispute with counsel for Cytogel.

51. Written communications regarding these issues began on November 22, 2011, when Cytogel's counsel asserted, by letter, that Dr. Zadina had used confidential information of Cytogel to develop the technology of the '436 Patent. On this basis, the letter asserted that Cytogel held all rights to the technology of the then-pending '436 Patent. Specifically, Cytogel's counsel broadly argued that "the intellectual property that emerges from Dr. Zadina's research relating to endomorphins or opioids rightfully belongs to Cytogel." The letter further stated that "[i]t is Cytogel's considered opinion that this technology belongs to Cytogel and it *cannot allow* Tulane and/or Zadina to license this new technology to anyone." (emphasis added). Nonetheless, the letter also stated that "Cytogel is looking to Tulane to resolve these issues in an amicable manner."

52. Subsequent discussions between Tulane and Cytogel representatives, however, did not resolve the issues relating to ownership of the '436 Patent. In repeated correspondence and other communications, Tulane's counsel implored Cytogel to provide any documentary evidence to support its contentions that Dr. Zadina had used confidential Cytogel information, gleaned from his work on Cyt-1010 Development, to invent the 2nd Generation compounds of the '436 Patent. Cytogel has failed to produce any suitable documentation for over four and a half years since the issue was first raised.

**VIII.   Cytogel's Specific Threats of Litigation**

53.     By late 2015, the VA and the U.S. Department of Justice became aware of the ongoing dispute between Tulane and Cytogel and, at Tulane's request, attended a meeting with Cytogel officials in New York City on January 20, 2016 in an effort to resolve issues surrounding ownership of the '436 Patent.  These efforts were unsuccessful.

54.     Subsequent phone conferences between Tulane's John Christie and Cytogel's CEO, Dean Maglaris, were also unsuccessful in resolving these issues.

55.     Thereafter, in a 5-page letter dated April 7, 2016 (the "2016 Cytogel letter") (attached as Exhibit E), Cytogel's counsel communicated directly with Dr. Zadina, asserting that he intentionally breached the Consultancy Agreement by "misappropriation of Cytogel's confidential business information and trade secrets" in developing opioid drugs as a Dual Appointment Personnel for Tulane and the VA, which included the drugs covered by the '436 Patent.  In support, the letter quoted the portion of the Consultancy Agreement that stated that "any inventions . . . that may result or emerge from materials or information provided by Cytogel . . . shall remain the *sole and exclusive property* of and for the benefit of Cytogel."  *Id.* (emphasis added).

56.     The 2016 Cytogel letter then discussed several "examples" (over several pages) that purported to show how Dr. Zadina "used confidential information and/or trade secrets" to breach the Consultancy Agreement.  Ex. E.  None of these alleged examples of Dr. Zadina's use of Cytogel information established any link between the asserted information and the novel and patentable features and properties of the 2nd Generation compounds, or provided any insight into how such information would have led to the development of the novel and distinct 2nd Generation compounds.  Many of the examples of alleged Cytogel confidential information

14

were, in fact, information that was generally known in the field or which was conveyed *by* Dr. Zadina *to* Cytogel, rather than the other way around. The letter concluded by stating that "absent a prompt agreed-upon resolution, Cytogel will have no choice but to pursue legal remedies in a court of law." *Id*.

57. In response, in a letter dated June 10, 2016 (the "DOJ letter") (attached as Exhibit F), the U.S. Department of Justice, writing on behalf of the VA (and joined by Tulane and Dr. Zadina), contested Cytogel's apparent assertions of sole ownership of the '436 Patent. In particular, the DOJ letter explained that Dr. Zadina had correctly and lawfully assigned his rights to the VA and Tulane, as the Cytogel letter only cited general research problems well known in the field of opioid development and to Dr. Zadina.

58. The DOJ letter also expressed the government's concern that "Cytogel's unsupported assertions [of ownership] have not only impeded efforts to license the ['436] patent and thereby collect royalties, but more importantly, have also stifled any efforts by private entities to develop pharmaceuticals using the compounds." Ex. F.

59. The DOJ letter concluded by inviting Cytogel to finally provide documentation to support its assertions of ownership of the '436 Patent.

60. Subsequently, the parties met in person in Washington, D.C. on August 9, 2016 in yet another attempt to resolve this matter. While Cytogel did, for the first time, provide Plaintiffs a small number of documents for inspection, the parties were unable to resolve the dispute over ownership of the '436 Patent. Subsequent communications with Cytogel similarly failed, necessitating the present suit.

61. Since 2010, Tulane has been working to license the 2nd Generation patent rights but has been impeded by Cytogel's ownership claims and Cytogel's lengthy delay in providing

the information necessary to resolve this issue.  Cytogel's actions already have caused the VA and Tulane to lose valuable licensing opportunities and will continue to do so as long as this dispute remains unresolved.

## IX.    Inventorship of the '436 Patent and Related Applications

62.    Cytogel has asserted *sole ownership* of the '436 Patent.  *See* Ex. E.  This assertion rests on Dr. Zadina's alleged violation of the Consultancy Agreement and alleged use of Cytogel confidential information in the work leading to the '436 Patent.  Implicit in this assertion is that Dr. Zadina is the sole inventor of the technology of the '436 Patent.

63.    In its correspondence with Plaintiffs, Cytogel has failed to address Dr. Hackler's status as an inventor, nor explained its apparent contention that Dr. Zadina is the sole inventor of the '436 Patent.

### COUNT I – DECLARATORY JUDGMENT OF PATENT OWNERSHIP

64.    Plaintiffs reallege and incorporate the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

65.    Under 35 U.S.C. § 261, patents have the attributes of personal property (as determined by state law), thus permitting the assignments of patents to others.  The presumption in patent law is that the inventors are owners.  Rights may then be contracted away or obtained by action of law as described in 37 C.F.R. § 501.6.  As described in the foregoing paragraphs, the 2nd Generation '436 Patent, as well as the pending '057, '813 and '249 Applications, were properly assigned to Tulane and the VA, from rights originally vested in the inventors, Drs. Zadina and Hackler.

66. Assignments from Drs. Zadina and Hackler to Tulane and the VA were recorded in the PTO for the '436 Patent, and the related '057, '813, and '249 Applications in accordance with the provisions of 35 U.S.C. § 261 and 37 C.F.R. § 3.11.

67. As a result of the acts described in the foregoing paragraphs, there exists a reasonable apprehension of litigation to warrant the issuance of a declaratory judgment of ownership. Specifically, based on Cytogel's repeated and unqualified assertions of its ownership of the technology of the '436 Patent and the related '057, '813, and '249 Applications and its written threats of litigation against Dr. Zadina, there undoubtedly exists a substantial controversy regarding ownership of the '436 Patent and the related pending applications.

68. This controversy already has impeded Plaintiffs' efforts to license the 2nd Generation technology embodied in the '436 Patent and the related '057, '813, and '249 Applications.

69. A judicial determination is necessary and appropriate so that Plaintiffs can clearly establish their rights as the sole owners of the '436 Patent and the '057, '813, and '249 Applications and be permitted to license the patented technology without interference from Cytogel.

70. Accordingly, Plaintiffs are entitled to a declaratory judgment that Plaintiffs are the sole owners of the '436 Patent and the '057, '813, and '249 Applications and that Cytogel holds no ownership rights to the '436 Patent or the related applications.

### COUNT II – DECLARATORY JUDGMENT OF PATENT INVENTORSHIP

71. Plaintiffs reallege and incorporate the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

72. The '436 Patent and the related '057, '813, and '249 Applications correctly list the co-inventors of its claimed subject matter: Drs. Zadina and Hackler. Thus, under federal law, the original ownership rights in the '436 Patent were vested with both Drs. Zadina and Hackler.

73. By asserting sole ownership of all intellectual property relating to the '436 Patent and related applications and threatening litigation on that basis, Cytogel is necessarily creating a substantial controversy as to whether Dr. Hackler, who never worked with Cytogel, is a true and correct co-inventor of the '436 Patent and the related '057, '813, and '249 Applications.

74. Accordingly, Plaintiffs have a reasonable apprehension that Cytogel will bring an action for correction of inventorship in order to establish sole ownership of the '436 Patent and the related '057, '813 and '249 Applications.

75. Pursuant to 35 U.S.C. § 256, Plaintiffs are entitled to a declaratory judgment that Drs. Zadina and Hackler are the true and correct inventors of the '436 Patent and the related '057, '813, and '249 Applications, confirming that the listed inventorship of the '436 Patent and the related applications is correct.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Tulane and the United States pray the Court enter judgment in their favor and against Defendant Cytogel as follows:

A. Determine and declare that Plaintiffs are the sole co-owners of the '436 Patent and the related '057, '813 and '249 Applications, and that Cytogel has no ownership rights in and no

license to the '436 Patent or the '057, '813 and '249 Applications or any other patent applications related to those applications;

    B.    Determine and declare that the listed inventorship on the '436 Patent and the related '057, '813, and '249 Applications, or any other future patent applications related to those applications, is correct;

    C.    An award of Plaintiffs' costs and attorneys' fees in this action; and

    D.    Such other and further relief as the Court deems just and proper.

August 19, 2016　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　KENNETH POLITE, JR.
　　　　　　　　　　　　　　　　　　　United States Attorney

　　　　　　　　　　　　　　　　　　　BENJAMIN C. MIZER
　　　　　　　　　　　　　　　　　　　Principal Deputy Assistant Attorney General

　　　　　　　　　　　　　　　　　　　JOHN FARGO
　　　　　　　　　　　　　　　　　　　Director

　　　　　　　　　　　　　　　　　　　LINDSAY K. EASTMAN
　　　　　　　　　　　　　　　　　　　Attorney

　　　　　　　　　　　　　　　　　　　s/Walter W. Brown
　　　　　　　　　　　　　　　　　　　WALTER W. BROWN (T.A.)
　　　　　　　　　　　　　　　　　　　Attorney
　　　　　　　　　　　　　　　　　　　Commercial Litigation Branch
　　　　　　　　　　　　　　　　　　　Civil Division
　　　　　　　　　　　　　　　　　　　U.S. Department of Justice
　　　　　　　　　　　　　　　　　　　Washington, D.C. 20530
　　　　　　　　　　　　　　　　　　　Telephone: (202) 307-0341
　　　　　　　　　　　　　　　　　　　Facsimile: (202) 307-0345
　　　　　　　　　　　　　　　　　　　Email: walter.brown2@usdoj.gov

　　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff United States*

August 19**,** 2016								s/Raymond G. Areaux
									Raymond G. Areaux (LA 16792) (T.A.)
									Carver Darden Koretzky Tessier Finn
									Blossman & Areaux LLC
									Energy Centre, Suite 3100
									1100 Poydras Street
									New Orleans, Louisiana 70163
									Telephone: (504) 585.3800
									Facsimile: (504) 585.3801
									Email: areaux@carverdarden.com

									Of Counsel:

									Arne M. Olson (*pro hac vice to be filed*)
									Alissa A. Digman (*pro hac vice to be filed*)
									Matthew De Preter (*pro hac vice to be filed*)
									OLSON AND CEPURITIS, LTD.
									20 North Wacker Drive, 36th Floor
									Chicago, Illinois 60606
									Telephone:  (312) 580-1180
									Facsimile:   (312) 580-1189

									*Attorneys for Plaintiff The Administrators of The Tulane Educational Fund*